S03A0559, S03X0560. HEAD v. HILL; and vice versa.
(587 SE2d 613)

CARLEY, Justice.

In a trial held in July and August of 1991, Warren Lee Hill was convicted and sentenced to death for the murder of Joseph Handspike. This Court unanimously affirmed the conviction and death sentence in March of 1993. *Hill v. State,* 263 Ga. 37 (427 SE2d 770) (1993).

Hill filed a petition for writ of habeas corpus on April 14, 1994, alleging that he was mentally retarded. The habeas court, erroneously invoking the procedure set forth in *Fleming v. Zant,* 259 Ga. 687 (386 SE2d 339) (1989), granted a limited writ ordering a jury trial in the original trial court on the question of mental retardation, with Hill bearing the burden of proof under the "preponderance of the evidence" standard. This Court reversed, holding that, although he could pursue relief under the "miscarriage of justice" provision of the habeas corpus statute by attempting to prove to the habeas court itself under the "beyond a reasonable doubt" standard that he was mentally retarded, Hill was not entitled to a jury trial under the preponderance of the evidence standard because he had been tried after the effective date of the statute providing defendants the opportunity to prove their mental retardation at trial. *Turpin v. Hill,* 269 Ga. 302 (498 SE2d 52) (1998).

The habeas court found on remand, in an order filed on May 16, 2002, that Hill succeeded in proving beyond a reasonable doubt that he had significantly subaverage intellectual functioning, but the habeas court further found that Hill failed to prove beyond a reasonable doubt the existence of impairments in adaptive behavior. Consequently, the habeas court concluded that Hill had failed to prove his alleged mental retardation beyond a reasonable doubt. See OCGA § 17-7-131 (a) (3) (defining mental retardation). On September 20, 2002, the habeas court filed a supplemental order, upon the Warden's motion, denying Hill's remaining claims. On November 22, 2002, the habeas court granted a motion for reconsideration filed by Hill and once again granted a limited writ ordering a jury trial on the issue of mental retardation, with Hill bearing the burden of proof by a preponderance of the evidence.

For the reasons set forth below, we reverse the habeas court's order granting the motion for reconsideration of the mental retarda-

tion claim in Case Number S03A0559, and we affirm the habeas court's denial of relief to Hill on other grounds in Case Number S03X0560.

## I. Factual Background

At the time of the murder of Joseph Handspike, both he and Hill were inmates at the Lee County Correctional Institute. Hill was serving a life sentence for murdering his former girlfriend by shooting her numerous times with a 9-millimeter handgun. On the morning of August 17, 1990, as Mr. Handspike slept, Hill removed a two-by-six board that served as a sink leg in the prison bathroom and forcefully beat the victim numerous times with the board about the head and chest as onlooking prisoners pleaded with him to stop. A prison guard witnessed the attack and testified at trial. Several prisoners testified that Hill mocked the victim as he beat him. The victim arrived at the hospital in a coma and died there.

## II. Alleged Mental Retardation

"Mentally retarded" under Georgia law "means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." OCGA § 17-7-131 (a) (3). Death penalty defendants tried on or after July 1, 1988 are entitled to present evidence of retardation to the jury at the guilt/innocence phase of their trials and, if found beyond a reasonable doubt to be retarded, to avoid a death sentence. OCGA § 17-7-131 (j). At his trial, Hill presented evidence of his intellectual slowness, but his psychological expert testified that Hill had an intelligence quotient of 77 and was not mentally retarded. Hill did not request that the jury be charged on a "guilty but mentally retarded" verdict.

Because Hill did not seek a jury determination of his alleged mental retardation at trial, that issue is procedurally defaulted. OCGA § 9-14-48 (d); Turpin v. Todd, 268 Ga. 820, 824 (2) (a) (493 SE2d 900) (1997); Black v. Hardin, 255 Ga. 239, 240 (4) (336 SE2d 754) (1985). Nevertheless, this Court held in the previous appeal in this case that the execution of a mentally retarded person whose retardation was not considered at trial would constitute a miscarriage of justice. Turpin v. Hill, supra at 303 (3) (b). Accordingly, this Court ordered the habeas court to consider Hill's claim of mental retardation "without intervention of [a] jury" under the beyond a reasonable doubt standard set forth in OCGA § 17-7-131. Turpin v. Hill, supra at 304 (4). However, the habeas court, on motion for reconsideration, once again granted a limited writ ordering a jury trial on the question of mental retardation, with Hill bearing the burden of proof

under the preponderance of the evidence standard.

(A) The habeas court concluded that Hill is now entitled to a jury trial on the issue of mental retardation under the authority of *Ring v. Arizona*, 536 U. S. 584, 602 (122 SC 2428, 153 LE2d 556) (2002), wherein the Supreme Court of the United States held that, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt[,]" and under *Atkins v. Virginia*, 536 U. S. 304 (122 SC 2242, 153 LE2d 335) (2002), wherein the Supreme Court announced a federal constitutional ban on executing mentally retarded persons. We hold that *Ring* and *Atkins* do not require a jury trial on Hill's alleged mental retardation for the following reasons:

(1) First, we hold that *Ring* does not have retroactive effect in the present case, a collateral review proceeding instituted after the appeals from the original trial have been completed. We have adopted the "pipeline" rule regarding the retroactivity of new rules of criminal law, and we apply that rule in conformity with at least the minimum guarantees applicable to the states under the United States Supreme Court's retroactivity jurisprudence. See *Luke v. Battle*, 275 Ga. 370 (565 SE2d 816) (2002); *Taylor v. State*, 262 Ga. 584, 586 (3) (422 SE2d 430) (1992). See also *Tyler v. Cain*, 533 U. S. 656 (121 SC 2478, 150 LE2d 632) (2001) (discussing the effect of a change in federal statutory law on retroactivity rules in second and subsequent federal habeas petitions); *Colwell v. State*, 59 P3d 463, 470 (III) (A) (Nev. 2002) (noting that the United States Supreme Court's retroactivity requirements represent the minimum requirements applicable to the states). In applying the pipeline rule, we have held that new rules of criminal procedure, as distinguished from substantive criminal law, generally cannot be applied retroactively. *Luke v. Battle*, supra at 370. A new rule of criminal law will have retroactive effect if it falls within one of the following two exceptions: new rules that place certain conduct beyond the power of the State to proscribe, that is, a change in substantive criminal law; and, watershed rules concerning procedures that are implicit in the concept of ordered liberty and that implicate the fundamental fairness and accuracy of the criminal proceeding. See *Bousley v. United States*, 523 U. S. 614, 619-620 (118 SC 1604, 140 LE2d 828) (1998); *Teague v. Lane*, 489 U. S. 288, 311 (V) (109 SC 1060, 103 LE2d 334) (1989) (plurality opinion).

We find that the rule announced in *Ring*, which overruled *Walton v. Arizona*, 497 U. S. 639 (110 SC 3047, 111 LE2d 511) (1990), was a *new* rule of criminal law. *Turner v. Crosby*, 339 F3d 1247, 1284 (IV) (B) (1) (11th Cir. 2003); *State v. Towery*, 64 P3d 828, 833 (III) (C) (Ariz. 2003); *Colwell v. State*, supra at 472-473 (III) (A). However, we also find that the new rule announced in *Ring*, assuming that its jury

requirement is even applicable to findings of mental retardation, does not fall within one of the two exceptions to non-retroactivity described above. The first exception clearly does not apply, and we find that the fundamental fairness and accuracy of determining mental retardation would not be increased by having a jury rather than a trial judge make the determination. *Turner v. Crosby*, supra at 1285 (IV) (B) (2); *State v. Towery*, supra at 834-835 (III) (D); *Colwell v. State*, supra at 473 (III) (A). See also *Ring v. Arizona*, supra at 621 (O'Connor, J., dissenting and noting that majority holding would not have retroactive effect under *Teague v. Lane*, supra).

(2) Second, even if *Ring* were retroactive, we do not find that it establishes a constitutional requirement that a jury determine the question of mental retardation regardless of the procedural posture of a case. *Ring*, like its predecessor, *Apprendi v. New Jersey*, 530 U. S. 466 (120 SC 2348, 147 LE2d 435) (2000), held that facts which determine the *upper* limit of punishment for particular criminal conduct must be proved to a jury unless, of course, the right to a jury is waived by the defendant. Factual findings of specific acts or omissions, of specific degrees of mens rea, or of the presence of one or more statutory aggravating circumstances result in "an *increase* in a defendant's authorized punishment. . . ." (Emphasis supplied.) *Ring v. Arizona*, supra at 602 (II). However, a claim of mental retardation is a means by which a death penalty defendant may seek to have his possible sentence *limited* despite the fact that the statutory elements for the death penalty might be present. Indeed, the Court in *Atkins* refers to mental retardation as an "exemption" from the death penalty. *Atkins v. Virginia*, supra at 320 (IV). Furthermore, *Ring* specifically noted that the defendant had made "no Sixth Amendment claim with respect to mitigating circumstances[,]" which indicates that the Court did not find a jury trial right for factors in mitigation of punishment, such as mental retardation. *Ring v. Arizona*, supra at 597 (II), fn. 4. The Supreme Court of Louisiana observed that "*Atkins* explicitly addressed mental retardation as an exemption from capital punishment, not as a fact the absence of which operates 'as the functional equivalent of an element of a greater offense.' [Cit.]" *State v. Williams*, 831 S2d 835, 860 (5), fn. 35 (La. 2002) (quoting *Ring v. Arizona*, supra at 609 (II)). Likewise, we conclude that the absence of mental retardation is not the functional equivalent of an element of an offense such that determining its absence or presence requires a jury trial under *Ring*.

Furthermore, in *Atkins*, the Supreme Court of the United States made clear that it was entrusting the states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban on the execution of the mentally retarded: "As was our approach in *Ford v. Wainwright*, with regard to insanity

[at the time of execution], 'we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.' [Cit.]" *Atkins v. Virginia*, supra at 317 (III) (quoting *Ford v. Wainwright*, 477 U. S. 399, 405 (106 SC 2595, 91 LE2d 335) (1986) (plurality opinion)). The plurality in *Ford* also stated the following: "We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests. . . ." *Ford v. Wainwright*, supra at 416 (V) (A).

> Instructive analogies may be found in [Florida's] own procedures for determining whether a defendant is competent to stand trial, Fla. Stat. §§ 916.11-916.12 (1985 and Supp. 1986), or in the comprehensive safeguards that Florida ensures to those subjected to involuntary commitment proceedings, Fla. Stat. § 394.467 (1986).

*Ford v. Wainwright*, supra at 417 (V) (A), fn. 4. None of these Florida statutes that the Court found to be instructive analogies for appropriate procedures for determining incompetence to be executed required a jury trial. We conclude that the binding authority of the portion of *Ford* quoted by the *Atkins* Court and the persuasive authority of the closely related portions of *Ford* not quoted in *Atkins* indicate that there is no constitutional right to a jury trial on the issue of mental retardation regardless of the procedural posture of a case. See also *State v. Williams*, supra at 860 ("[T]he majority of states which have provided a *statutory* exemption from capital punishment for the mentally retarded have made the finding of mental retardation a matter for the trial judge as opposed to the jury." (Emphasis supplied.)).

(3) Third, Hill *could have obtained* a jury finding on his alleged mental retardation in his original trial if he had asked for one. OCGA § 17-7-131 (c) (3), (j). Instead, he presented expert testimony showing that he had an intelligence quotient of 77, which is somewhat slow but not mentally retarded, and argued that he had functioned admirably well in society and in his family life despite his intellectual shortcomings. Therefore, regardless of whether *Ring* is retroactive or ever requires a jury determination of mental retardation, we cannot regard Hill as having been denied a jury trial on his alleged mental retardation, because he had such a right at trial and waived it. Having done so, Hill is now entitled only to have the habeas court determine, as this Court directed on remand, whether a miscarriage of justice would result if Hill were executed, in light of his alleged mental retardation. OCGA § 9-14-48 (d); *Turpin v. Hill*, supra at 303 (3) (b). Thus, we reiterate our holding in the first appeal in this case that such an alleged miscarriage of justice must be considered by the

habeas court itself, "without intervention of [a] jury. . . ." *Turpin v. Hill*, supra at 304 (4).

(B) The habeas court also concluded that Hill must prove his alleged mental retardation only by a preponderance of the evidence and that the beyond a reasonable doubt standard which this Court ordered applied on remand is unconstitutional. The habeas court reasoned that the newly recognized federal constitutional ban on the execution of mentally retarded persons announced in *Atkins* could not be enforced with sufficient due process protections under the beyond a reasonable doubt standard. However, the exemption from death sentences for mentally retarded persons is not new to Georgia death penalty defendants, and this Court has already determined that, under the *principles* of federal constitutional law, it is acceptable to apply the beyond a reasonable doubt standard of proof to a mental retardation claim at trial. *Mosher v. State*, 268 Ga. 555, 558-560 (4) (491 SE2d 348) (1997). *Atkins* announced a new federal constitutional prohibition against executing an entire class of persons. We deem this exemption to be comparable to placing certain conduct beyond the power of the State to punish and, accordingly, we must give the new federal right to death penalty exemption retroactive effect to the extent that it exceeds any preexisting, comparable State right. *Bousley v. United States*, supra at 619-620; *Penry v. Lynaugh*, 492 U. S. 302, 330 (IV) (A) (109 SC 2934, 106 LE2d 256) (1989) ("In our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all."); *Teague v. Lane*, supra at 311 (V); *Luke v. Battle*, supra at 370. See also *United States v. Johnson*, 2003 U. S. Dist. LEXIS 3778, *31 (F) (N.D. Ill. March 11, 2003) (government conceded retroactivity of *Atkins*). Now that the Georgia exemption from death sentences for mentally retarded persons is paralleled by a new federal exemption, we must determine whether, under the *authority* of federal constitutional law, the beyond a reasonable doubt standard continues to be an acceptable standard of proof to apply to mental retardation claims.

As we noted above, *Atkins* specifically left " 'to the States the task of developing appropriate ways to enforce the [federal] constitutional restriction' " on executing the mentally retarded. *Atkins v. Virginia*, supra at 317 (III). Furthermore, nothing in *Atkins* instructs the states to apply any particular standard of proof to mental retardation claims. "[T]he United States Supreme Court has not mandated a particular standard, but has left the task to the individual states . . . ." *Murphy v. State*, 54 P3d 556, 568, fn. 20 (Okl. Crim. App. 2002). Therefore, we must apply Georgia law, which was the first in the nation to prohibit the execution of the mentally retarded, in a manner which is consistent with established federal constitu-

tional principles as they have been announced with respect to other, comparable rights.

As we reasoned in *Mosher*, a mental retardation claim is comparable to a claim of insanity at the time of the crime in that both relieve a guilty person of at least some of the statutory penalty to which he would otherwise be subject. Accordingly, we took guidance from *Leland v. Oregon*, 343 U. S. 790 (72 SC 1002, 96 LE 1302) (1952), which approved application of the beyond a reasonable doubt standard to insanity claims, and we concluded that the same standard could be applied constitutionally to mental retardation claims. *Mosher v. State*, supra at 559-560 (4). We again find the comparison between claims of insanity and of mental retardation to warrant a conclusion that the beyond a reasonable doubt standard may be applied constitutionally to mental retardation claims.

Furthermore, as expressed in *Mosher*, supra at 560 (4), we again distinguish the fundamental right not to stand trial implicated in *Cooper v. Oklahoma*, 517 U. S. 348 (116 SC 1373, 134 LE2d 498) (1996) from the procedural burden of proving mental retardation. Contrary to the dissent's obviously inaccurate reading of *Mosher*, this Court specifically applied federal precedent and did not hold that such "precedent had no bearing on what burden of proof could be imposed. . . ." Dissenting opinion, p. 271, fn. 13. Indeed, we have repeatedly rejected the application of *Cooper*'s preponderance of the evidence standard to cases involving retardation even as the number of other jurisdictions requiring proof by a higher standard has increased from two to five. Dissenting opinion, p. 274, fn. 26; *Head v. Ferrell*, 274 Ga. 399, 412 (VI) (554 SE2d 155) (2001); *Jenkins v. State*, 269 Ga. 282, 292 (17) (498 SE2d 502) (1998) (over a dissent at 298-300 based on *Cooper*); *Mosher v. State*, supra; *Murphy v. State*, supra at 568, fn. 20. Both courts and legislatures have had little time to develop this area of the law and, in choosing a particular standard of proof, we are the only state supreme court that has had the benefit of a legislative judgment that the reasonable doubt standard is appropriate. As Hill concedes, no other state legislature has enacted that standard for retardation determinations in death penalty cases. However, since *Atkins*, one state court has relied, as this Court now does, on a statute which requires a standard higher than preponderance of the evidence. *State v. Grell*, 66 P3d 1234, 1240 (B) (2) (Ariz. 2003). Since the reasonable doubt standard is clearly constitutionally permissible for insanity determinations, and we have already applied *Cooper* and other federal authority to the choice of a standard of proof in mental retardation cases, and the General Assembly has selected the reasonable doubt standard, we believe that *Cooper* should not be extended to retardation decisions unless the Supreme Court of the United States so requires at some future date.

Hill argues that additional protection for the mentally retarded is necessary because *Atkins* recognized that truly mentally retarded persons may face a "special risk of wrongful execution." *Atkins v. Virginia*, supra at 321 (IV). However, we conclude that the special risks and limitations suffered by truly mentally retarded persons at trial are sufficiently counterbalanced by the joint safeguards of Georgia's procedure for demonstrating incompetency to stand trial under the preponderance of the evidence standard and mental retardation under the beyond a reasonable doubt standard. See OCGA §§ 17-7-130, 17-7-131 (c) (3), (j); *Partridge v. State*, 256 Ga. 602, 603 (1) (351 SE2d 635) (1987) ("the defendant has the burden to prove incompetency by a preponderance of the evidence").

We also conclude that a higher standard of proof serves to enforce the General Assembly's chosen definition of what degree of impairment qualifies as mentally retarded under Georgia law for the purpose of fixing the appropriate criminal penalty that persons of varying mental impairment should bear for their capital crimes, in light of their individual "diminish[ed] . . . personal culpabilit[ies]" and the varying degrees of deterrence possible. *Atkins v. Virginia*, supra at 318-320 (IV). Immediately before its statement that it was "'leav[ing] to the States the task of developing appropriate ways to enforce the constitutional restriction'" on executing mentally retarded persons, the Court in *Atkins* recognized that, despite a "national consensus" against executing mentally retarded persons, there might be "serious disagreement . . . in determining which offenders are in fact retarded." *Atkins v. Virginia*, supra at 317 (III). In view of the lack of national consensus as to which mentally impaired persons are constitutionally entitled to an exemption from death sentences, we conclude that the Georgia General Assembly, the first legislative body to create such an exemption, was originally and now remains within constitutional bounds in establishing a procedure for considering alleged mental retardation that limits the exemption to those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt.

Hill would have borne the burden of proof of his alleged mental retardation under the beyond a reasonable doubt standard if he had raised a mental retardation claim at trial. Having concluded that such standard of proof would have been constitutionally permissible at trial, we see no reason why Hill should bear a lighter burden under the miscarriage of justice exception in this habeas corpus case. See *Head v. Ferrell*, supra at 402 (III) (noting that "an extremely high standard applies" to miscarriage of justice claims). Accordingly, we conclude that the habeas court, having previously found that Hill had failed to prove his mental retardation beyond a reasonable doubt, erred in granting Hill's motion for reconsideration and order-

ing the application of a lower standard of proof.

(C) The Warden argues that the habeas court exceeded its jurisdiction on remand in ordering a jury trial on Hill's alleged mental retardation and the application of the preponderance of the evidence standard, both of which were contrary to this Court's direction.

> When an appellate court vacates a [lower] court's judgment and remands for findings of fact and conclusions of law on a specific issue, this does not permit the [lower] court to reopen the case for other purposes. Instead, the scope of the [lower] court's authority to act on remand is limited to the specific purpose of making the applicable findings and conclusions.

*Marsh v. Way*, 255 Ga. 284, 285 (2) (336 SE2d 795) (1985). Consequently, the habeas court had no authority to disregard this Court's order. We decline to address the additional ground raised by the Warden regarding the timing of the habeas court's order granting the motion for reconsideration.

(D) Because we conclude that the habeas court erred in ordering a jury trial on Hill's alleged mental retardation, in ordering the application of the preponderance of the evidence standard, and in exceeding its limited authority on remand, we vacate the habeas court's order granting the motion for reconsideration of Hill's mental retardation claim and remand the case again for re-entry of an order in compliance with our previous direction.

### III. Claims Barred by Res Judicata

The habeas court properly found claims previously rejected by this Court in Hill's direct appeal to be barred by res judicata. "[A]ny issue raised and ruled upon in the petitioner's direct appeal may not be reasserted in habeas corpus proceedings. . . ." *Gaither v. Gibby*, 267 Ga. 96, 97 (2) (475 SE2d 603) (1996). The following issues are barred to the extent that they were raised in Hill's direct appeal: whether the State improperly commented on Hill's silence and whether the curative instruction given in response to the comment was sufficient; whether the prosecutor made improper reference to the Bible in closing argument in the sentencing phase; whether the State or trial court violated *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986); whether the trial court erred in excluding as irrelevant evidence of the victim's character in the sentencing phase; whether the evidence supported the OCGA § 17-10-30 (b) (7) aggravating circumstance; whether the trial court's misstatement before the beginning of the sentencing phase that aggravated assault was a capital felony was reversible error; whether the trial court

erred in finding jurors Flowers and Daniel unqualified to serve; whether the trial court improperly limited voir dire; whether the District Attorney's comment to juror Mackey regarding the jury not actually "sending" the defendant to death required reversal; whether the allegedly unreasonable length of the trial days constituted error; whether the trial court erred in replacing an ill juror; whether the trial court committed reversible error during the guilt/innocence phase by admitting evidence regarding Hill's murder of his girlfriend; whether the trial court erred in allowing two witnesses to give rebuttal testimony in the sentencing phase; whether the trial court erred in allowing the prosecutor to see the report of Hill's psychologist during the trial; whether the evidence was sufficient to support the conviction and death sentence; and, whether Hill's death sentence or Georgia death sentences in general are arbitrary, capricious, discriminatory, or disproportionate.

## IV. Claims Barred by Procedural Default

Claims which could have been raised at trial or on direct appeal, but which are raised for the first time in habeas corpus proceedings, and which do not involve sentencing phase jury instructions in death penalty trials, are barred by procedural default unless the petitioner meets the "cause and prejudice" test. OCGA § 9-14-48 (d); *Turpin v. Todd,* supra at 824 (2) (a); *Black v. Hardin,* supra at 240 (4). Compare *Stynchcombe v. Floyd,* 252 Ga. 113, 114-115 (311 SE2d 828) (1984) (addressing sentencing phase jury charges in death penalty cases). That test is satisfied only where a force external to the defense impeded counsel's efforts to raise a defaulted claim at trial or on appeal or where counsel rendered constitutionally deficient performance in waiving the claim at trial or omitting it on appeal. The test also requires that the omission or waiver resulted in actual, substantial prejudice that infected the petitioner's entire trial with error of constitutional dimensions. *Head v. Ferrell,* supra at 401-402 (III); *Turpin v. Todd,* supra at 824-829 (2); *Turpin v. Mobley,* 269 Ga. 635, 637 (2) (502 SE2d 458) (1998). The test is not applied to defaulted claims where necessary to prevent a "miscarriage of justice," but an extremely high standard applies in such cases. *Head v. Ferrell,* supra at 402 (III); *Valenzuela v. Newsome,* 253 Ga. 793, 796 (4) (325 SE2d 370) (1985).

The following claims in Hill's cross-appeal are barred by procedural default to the extent that they concern issues not raised on direct appeal: alleged suppression of evidence; false testimony and arguments; improper comments by the State in its opening statement, in its closing argument, and during the sentencing phase; interference by the prosecutor and the trial court with the defense's

investigation; discovery violations by the State; juror bias, misconduct, and influence by third parties; improper communication between the trial judge and the jurors; exclusion in the guilt/innocence phase of evidence of past sexual and physical assaults allegedly committed by the victim, who was sleeping when he was murdered; denial of funds for expert assistance for jury selection issues; denial of additional funds for investigation and mental health examinations; various errors in the trial court's guilt/innocence phase jury charge; the trial court's error in responding to the jury's questions during the sentencing phase; error in failing to strike jurors Mackey, Davis, Kearse, Kirkland, and Childers; racial bias in the trial court's conduct of voir dire; improper exclusion of jurors opposed to the death penalty; the trial court's coercing a prisoner to testify; inadequate sequestration of the jury; excessive security; improper hearsay testimony; improper limitation of cross-examination; improper excusing of jurors for hardship; admission of inflammatory and unduly prejudicial evidence; error by the trial court in unsealing the ex parte transcripts prior to the motion for new trial; invalidity of the OCGA § 17-10-30 (b) (1) aggravating circumstance in Hill's case; tainting of the indictment by discrimination, bias, pre-trial publicity, and the State's failure to present exculpatory evidence; the arbitrary discretion exercised by the District Attorney in seeking the death penalty; the unconstitutionality of the Unified Appeal Procedure; the bias of the jury against Hill in the sentencing phase after finding him guilty of the murder; use in sentencing of an unconstitutionally obtained prior conviction and of improper aggravating evidence; race discrimination by the "decision makers" in Hill's case; the invalidity of the conviction in light of allegedly inadequate medical care provided to the victim; and, cumulative error.

Applying the law described above regarding procedurally defaulted claims, we find that Hill has failed to overcome the bar to any of these claims, most of which are raised in this cross-appeal in summary fashion.

## V. Sentencing Phase Jury Charges

Claims of error in the sentencing phase jury charges in a death penalty case are not subject to procedural default. *Tucker v. Kemp*, 256 Ga. 571, 573-574 (351 SE2d 196) (1987); *Stynchcombe v. Floyd*, supra at 114-115. However, we find no merit in Hill's contentions regarding those charges.

(A) The jury was not misled to believe that they were to determine Hill's sentence for any crime other than the one murder. *Palmer v. State*, 271 Ga. 234, 238 (6) (517 SE2d 502) (1999) (examining a challenged sentencing phase jury instruction in light of the charge as

a whole and concluding that jury was not misled).

(B) We find that the jury was not misled regarding the OCGA § 17-10-30 (b) (2) aggravating circumstance by the trial court's instruction as it would have been understood in connection with the jury's sentencing verdict form and written instructions. *Palmer v. State*, supra. Furthermore, failure of the (b) (2) aggravating circumstance would not affect Hill's death sentence, because the independent (b) (1) aggravating circumstance supported that sentence. See *Colwell v. State*, 273 Ga. 634, 642 (11) (d) (544 SE2d 120) (2001).

(C) We find no error in the following areas of the trial court's charge, as to which Hill makes conclusory allegations: the jury's consideration of mitigating evidence; the verdict form; the trial court's alleged expression of opinion; the definition of the OCGA § 17-10-30 (b) (7) aggravating circumstance; jury unanimity; general sufficiency of the charges at the beginning and the end of the sentencing phase; the possibility of parole and the presumption that the jury's verdict would be carried out; the role of a parole waiver agreement, which had not been reached in Hill's case; and reasonable doubt, which was properly charged in the guilt/innocence phase.

## VI. Alleged Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance, a defendant must show that counsel rendered deficient performance and that actual prejudice resulted. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985). Counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[,]" and counsel's performance is evaluated without reference to hindsight. *Strickland v. Washington*, supra at 689-690 (III) (A). A petitioner has suffered actual prejudice only where "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Cit.]" *Smith v. Francis*, supra at 783 (1). Ineffective assistance claims are mixed questions of law and fact. We accept the habeas court's findings of fact unless clearly erroneous and independently apply the law to those facts. *Strickland v. Washington*, supra at 698 (IV); *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993). Applying the law described above, we conclude that Hill's claims of ineffective assistance of trial and appellate counsel are without merit.

(A) Hill contends that the trial court's denial of additional funds for investigation expenses rendered his trial attorneys ineffective. However, the habeas testimony of Hill's trial counsel and investiga-

tor and the documentary evidence do not support Hill's assertion that his lawyers' strategy, preparation, and trial performance were deficient. The record reveals that Hill's trial attorneys and investigator made vigorous efforts to interview family members, prison inmates, and prison staff and to obtain Hill's school, medical, and Navy records. The interviews and records indicated that Hill was intellectually slow, suffered fevers and convulsions as a child, suffered from seizures or drug-induced delirium several times in his later life, was kidnapped and possibly molested as a child, was physically abused by his mother as a child, worked and provided money to his family from the age of twelve into his adulthood, advanced quickly in the Navy, becoming a nuclear weapons loader, and suffered a precipitous personal decline upon breaking up with his girlfriend, which resulted eventually in his murdering her in public. Counsel also determined that Hill's father was an alcoholic, was abusive to Hill's mother, and was extremely neglectful of Hill and his siblings' emotional and physical needs. The trial court authorized funds for all of this investigative work and for psychological testing of Hill, which focused on his family and medical history, his intellectual slowness, and his perception that Mr. Handspike had a sexual interest in him, all of which were testified to by Hill's psychological expert at trial.

The few instances where Hill showed that additional documents and testimony might have been available if his trial counsel had investigated further or had gone in person to request documentary records fail to demonstrate either that counsel rendered deficient performance or that prejudice of constitutional proportions resulted from the absence of those items at trial. Hill's trial attorneys reasonably abandoned their efforts to obtain certain school records, after making repeated requests, when they, as well as the trial court, were informed that no further records existed. Counsel also did not perform deficiently in failing to request certain other school records when Hill's mother incorrectly informed counsel that Hill had begun his schooling in a different school district. Furthermore, the standardized test scores in the newly discovered records would have been merely cumulative of other evidence of Hill's mental slowness, including the testimony of his psychiatrist, and, therefore, trial counsel's failure to obtain the additional records did not result in prejudice to Hill. Likewise, particularly in light of the similar testimony presented at trial, Hill did not suffer prejudice from his trial attorneys' failure to obtain testimony like that which he presented in the habeas court from his family, teachers and the defense investigator regarding his intellectual abilities. Hill also failed to demonstrate that he suffered constitutionally significant prejudice from his trial counsel's failure to present testimony from Navy personnel in an effort to counter the impression left by his Navy record that he had

performed well. Even if Hill's psychological expert had altered his trial testimony in light of the newly discovered documents and testimony in the manner he claimed in the habeas proceeding that he would have, we do not find that this altered trial testimony would have in reasonable probability changed the outcome of the case.

Hill's trial attorneys presented testimony in the sentencing phase about his alcoholic and abusive father, his family's poverty, his lack of adequate clothing and food, his childhood and adulthood medical and psychological problems, his personal decline following a breakup with his girlfriend, and his work history and support of his family. Hill argues that counsel should have also presented testimony that his mother, who testified on his behalf in the sentencing phase, and his grandfather had beaten him as a child; that other members of his family have suffered seizures; and, that he and some of his siblings had been kidnapped by a man who, according to Hill's habeas affidavits, molested one of his brothers after he and the other siblings escaped the kidnapping and who, in another incident, committed statutory rape on a girl. We find, in light of the compelling testimony actually presented, that trial counsel did not render deficient performance in failing to present additional testimony and that Hill did not suffer prejudice from its absence.

Hill also contends that his trial attorneys rendered ineffective assistance in preparing and presenting evidence of the victim's alleged violent and sexually aggressive conduct as evidence in mitigation. The habeas and trial records reveal that trial counsel interviewed prison inmates and staff, discussed the matter with Hill, attempted to elicit testimony on the subject from witnesses from the prison at trial, and presented testimony from his psychological expert regarding how Hill would have reacted to such conduct in light of his psychological health and background. We do not find that counsel performed deficiently in preparing and presenting evidence of alleged provocation by the victim. See also *Hill v. State*, supra at 44-45 (16) (holding that the " 'personal characteristics of the victim' " are generally not relevant, even in the sentencing phase).

We find no merit in Hill's ineffective assistance claims regarding four prospective jurors. Counsel's conduct during voir dire of jurors Mackey and Mosley was reasonable in light of those jurors' expressions of uncertainty regarding their ability to impose a death sentence, and neither of those jurors would have been excusable for favoring the death penalty too strongly. Trial counsel did not perform unreasonably in the voir dire of juror Giddens, who expressed her squeamishness about gory photographs but indicated that she would remain impartial. Counsel did not perform unreasonably in the voir dire of juror McCorkle. That juror voluntarily disclosed her experience with a young black man who had been committed to a mental

institution after harassing her repeatedly, but she indicated that she thought she could be a fair juror.

Hill's remaining ineffective assistance of trial counsel claims are so lacking in specific argument that they are incapable of being meaningfully discussed. We deem these claims to be abandoned. See Supreme Court Rule 22.

(B) Hill further contends that his appellate counsel rendered ineffective assistance in failing to argue on appeal that the trial court erroneously denied sufficient funds for the defense's investigation. As our discussion above of trial counsel's actual investigation of the case reveals, Hill has not shown that he suffered prejudice from the trial court's decisions regarding funding. We conclude, therefore, that Hill has failed to show either deficient performance of appellate counsel or prejudice stemming therefrom. See *Shorter v. Waters*, 275 Ga. 581, 584-585 (571 SE2d 373) (2002) (holding that "a habeas petitioner [must] establish by a preponderance of the evidence that an ignored issue [on appeal] outweighed the enumerated errors"). Similarly, we find no merit in Hill's remaining, conclusory allegations of appellate counsel's ineffective assistance.

*Judgment reversed and case remanded in S03A0559. Judgment affirmed in S03X0560. All the Justices concur, except Fletcher, C. J., Sears, P. J., and Benham, J., who dissent.*

SEARS, Presiding Justice, dissenting.

1. This case is not merely about the procedures involved in proving a statutory defense. To the contrary, we are deciding today whether the state's procedures for guaranteeing a fundamental constitutional right are sufficiently protective of that right. United States Supreme Court precedent instructs that the Federal Constitution's guarantee of procedural due process, as made applicable to the states through the Fourteenth Amendment, forbids the state from requiring a defendant convicted of a capital crime to prove his claim of mental retardation beyond a reasonable doubt. Rather, a condemned prisoner who claims mental retardation may only be held to a preponderance of the evidence standard. Because the majority opinion errs by upholding the beyond a reasonable doubt standard, I respectfully dissent.

2. As the majority concedes,[1] in *Atkins v. Virginia*,[2] the United States Supreme Court established a fundamental right under the Federal Constitution prohibiting the states from executing mentally retarded persons convicted of capital crimes. The majority posits that in *Atkins,* the United States Supreme Court "made clear that it was

---

[1] Maj. op. at 258.
[2] 536 U. S. 304 (122 SC 2242, 153 LE2d 335) (2002).

entrusting the [individual] states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban on the execution of the mentally retarded."[3] Hence, the majority concludes, Georgia is free in OCGA § 17-7-131 (c) (2) to require condemned prisoners to establish the fact of their mental retardation beyond a reasonable doubt. This reasoning, however, cannot withstand scrutiny.

When concluding that the state has unfettered power to develop its own procedures for enforcing the federal ban on executing the mentally retarded, the majority opinion states that the United States Supreme Court delegated this same authority to the states in *Ford v. Wainwright*,[4] in which the Court ruled that insane persons are protected from execution under the Fourteenth Amendment and held unconstitutional Florida's statutory procedure for determining whether a convicted defendant is insane.[5] *Ford v. Wainwright*, however, plainly holds that the state's power to enforce the federal ban on executing insane persons is circumscribed by the Eighth and Fourteenth Amendments to the Federal Constitution: "Once a substantive right or restriction is recognized in the Constitution . . . its enforcement is in no way confined to the rudimentary process deemed adequate in ages past"[6] and federal constitutional standards will determine the adequacy of the state procedures upholding the right or enforcing the restriction.[7]

This rule of law was clarified in *Cooper v. Oklahoma*,[8] in which the Supreme Court held unconstitutional under the Fourteenth Amendment a state statute requiring death penalty defendants to prove by clear and convincing evidence their incompetence to stand trial, and ruled that such defendants can be held to nothing higher than a preponderance of the evidence standard.[9] Regarding the State's power to "develop the procedures necessary to enforce the . . . federal constitutional ban"[10] on prosecuting incompetent criminal defendants, the High Court said:

It is normally within the power of the State to establish the procedures through which its [death penalty] laws are given effect, including those relating to the burden of producing evidence and the burden of persuasion. . . . [However,] the

---

[3] Maj. op. at 258.

[4] 477 U. S. 399, 405 (106 SC 2595, 91 LE2d 335) (1986).

[5] Maj. op. at 259.

[6] 477 U. S. at 410.

[7] 477 U. S. at 413-418.

[8] 517 U. S. 348 (116 SC 1373, 134 LE2d 498) (1996).

[9] 517 U. S. at 355-356, 363-364.

[10] Maj. op. at 258.

State's power to regulate procedural burdens [is] subject to proscription under the Due Process Clause if it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." This case involves such a rule.[11]

As established by the *Atkins* decision, the issue at stake in the present appeal — what burden of proof the state may impose upon a condemned prisoner who would avoid the death penalty due to mental retardation — implicates a fundamental principle of justice that has become firmly established in the nation's conscience and tradition — the right of mentally retarded people to be protected from execution by the state.[12] As made clear by the precedent discussed above, it follows that the state's power to establish the procedures necessary to enforce the federal constitutional ban on executing the mentally retarded is not left to the state's wholesale discretion, but rather must conform to the United States Constitution's guarantee of procedural due process. The majority errs by holding otherwise.[13]

3. Having established that the procedures employed by the state to enforce the federally recognized right of the mentally retarded to be protected from state-sanctioned execution are subject to federal standards, the inquiry turns to whether Georgia's beyond a reasonable doubt standard can withstand scrutiny under the Federal Constitution. As explained below, it cannot.

As mentioned above, in *Cooper v. Oklahoma*,[14] the United States Supreme Court considered what standard a capital defendant would have to satisfy in order to show that he was incompetent to stand trial. The Court unanimously rejected Oklahoma's contention that it could hold the defendant to a clear and convincing standard, and ruled that only a preponderance of the evidence standard would satisfy federal constitutional muster. After noting that the state did not

---

[11] *Cooper v. Oklahoma*, 517 U. S. at 367-368, quoting *Patterson v. New York*, 432 U. S. 197, 201-202 (97 SC 2319, 53 LE2d 281) (1977). Accord *Leland v. Oregon*, 343 U. S. 790 (72 SC 1002, 96 LE2d 1302) (1952).

[12] *Atkins*, 536 U. S. at 315-316 (the fact that between 1986 and 2001, seventeen states and the federal government enacted bans on executing the mentally retarded is "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal").

[13] The majority's reliance upon *Mosher v. State*, 268 Ga. 555 (491 SE2d 348) (1997) is misplaced. That opinion upheld OCGA § 17-7-131 (c) (2)'s "beyond a reasonable doubt" standard only because at the time of that decision, there was no federal ban on executing the mentally retarded and hence, federal precedent had no bearing on what burden of proof could be imposed on condemned defendants who seek to prove their mental retardation. 268 Ga. at 560. Obviously, that rationale became invalid in 2002 when *Atkins* announced a federal ban on executing mentally retarded persons.

[14] See note 8, supra.

contend it could require a defendant to prove incompetence beyond a reasonable doubt (and indicating that such an argument would be rejected on its face),[15] the Court held that procedural due process does not permit the state to prosecute a defendant once he has "demonstrated that he is more likely than not incompetent."[16] The Court based its decision upon the significant

> risks inherent in [the state's] practice of requiring the defendant to prove incompetence by clear and convincing evidence. . . . "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' [Cit.]" The "more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision."[17]

Oklahoma's practice of requiring an accused to prove incompetence by clear and convincing evidence was found to violate the constitutional guarantee of procedural due process because

> [f]ar from "jealously guarding" an incompetent criminal defendant's fundamental right not to stand trial, [the state statute] requiring the defendant to prove incompetence by clear and convincing evidence imposes a significant risk of an erroneous determination that the defendant is competent.[18]

*Cooper* (and the precedent upon which it is based) instructs that Georgia's statute requiring condemned defendants to prove their alleged mental retardation beyond a reasonable doubt violates due process. Georgia's scheme for enforcing the federal ban on executing the mentally retarded is fraught with even greater risks than those at issue in *Cooper*. The burden of proof imposed on Georgia's mentally retarded defendants — beyond a reasonable doubt — is the most stringent in our criminal justice system, and defendants who

---

[15] 517 U. S. at 355.

[16] 517 U. S. at 355. In its decision, the Court noted that historically, incompetence has been treated synonymously with insanity. 517 U. S. at 357, n. 8.

[17] 517 U. S. at 363, quoting *Addington v. Texas*, 441 U. S. 418, 423 (99 SC 1804, 60 LE2d 323) (1979) and *Cruzan v. Director, Mo. Dept. of Health*, 497 U. S. 261, 283 (110 SC 2841, 111 LE2d 224) (1990).

[18] 517 U. S. at 363, quoting *Jacob v. New York City*, 315 U. S. 752, 752-753 (62 SC 854, 86 LE 1166) (1942).

seek to satisfy this burden in order to avoid the death penalty bear an enormous risk of erroneous decisions.[19] That risk is compounded by the diminished capacity of mentally retarded offenders, who are more prone than others to make false confessions,[20] and who also exhibit

> [a] lesser ability . . . to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors . . . may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and [whose] demeanor may create an unwarranted impression of lack of remorse for their crimes. . . . **Mentally retarded defendants in the aggregate face a special risk of wrongful execution.**[21]

Furthermore, it is obvious that the consequences of an erroneous rejection of a capital defendant's claim of mental retardation are extreme and irredeemable. In capital proceedings, especially, courts should always demand factfinding procedures that uphold a heightened standard of reliability.[22] This is especially crucial when dealing with the mentally retarded, whose diminished capacities leave them vulnerable to a unique and significant risk of being wrongfully executed. Far from "jealously guarding"[23] the fundamental right of the mentally retarded to avoid execution, the majority opinion subjects them to this heightened risk, thereby increasing the likelihood of erroneous rejections of retardation claims, which will invariable lead to wrongful executions.

4. The Constitution cannot simultaneously limit the state to the preponderance of the evidence standard when seeking to prosecute a capital defendant who claims incompetence, yet allow the state to impose the beyond a reasonable doubt standard when that same defendant, after being convicted and sentenced to death, claims mental retardation. The majority opinion errs by concluding otherwise.

Even though a condemned prisoner does not enjoy the same presumptions as a criminal defendant who is yet to be tried, he has not altogether lost the protections of the Constitution, either. If the Con-

---

[19] *Cooper*, 517 U. S. at 363-364.

[20] *Atkins*, 536 U. S. at 320. Recently, at least two mentally retarded death row inmates who confessed to capital crimes they did not commit have been exonerated due to DNA evidence. See "Porter Fully Savors First Taste of Freedom," Chicago Tribune, Feb. 6, 1999, p. N1; "Death Row Inmate Gets Clemency," Washington Post, Jan. 15, 1994, p. A1.

[21] *Atkins*, 536 U. S. at 320-321 (emphasis supplied).

[22] *Ford*, 477 U. S. at 411.

[23] *Cooper*, 517 U. S. at 363.

stitution dictates that such a prisoner's

> execution [is] contingent upon establishment of a further fact [such as the lack of mental retardation], then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding.[24]

In other words, due process forbids the state from imposing a higher evidentiary burden on a condemned prisoner when determining his competency for execution than the burden borne by the prisoner at trial. Accordingly, I would hold that the state is estopped from executing a condemned defendant once he has "demonstrated that he is more likely than not"[25] mentally retarded.

5. Although Georgia was the first state in the nation to prohibit the execution of mentally retarded persons, it is now the only state that requires condemned defendants to prove their retardation beyond a reasonable doubt.[26] Despite the federal ban on executing the mentally retarded, Georgia's statute, and the majority decision upholding it, do not prohibit the state from executing mentally retarded people. To the contrary, the State may still execute people who are in all probability mentally retarded. The State may execute people who are more than likely mentally retarded. The State may even execute people who are almost certainly mentally retarded. Only if a mentally retarded person succeeds in proving their retardation beyond a reasonable doubt will his or her execution be halted. Based upon the precedent discussed above, I am convinced this situation violates the tenets of due process as that concept is embodied in our Federal Constitution. Therefore, I dissent.

I am authorized to state that Chief Justice Fletcher and Justice Benham join me in this dissent.

DECIDED OCTOBER 6, 2003 —
RECONSIDERATION DENIED NOVEMBER 7, 2003.

---

[24] *Ford*, 477 U. S. at 411-412.

[25] *Cooper*, 517 U. S. at 355.

[26] Of those states that permit the death penalty, eighteen have announced standards to protect the mentally retarded from execution. Ten states employ a "preponderance of the evidence" standard, while five states employ a "clear and convincing" standard. Bills regarding the standard of proof in mental retardation cases appear to be pending in two states.

*Thurbert E. Baker, Attorney General, Patricia B. Attaway Burton, Assistant Attorney General*, for appellant.

*Brian S. Kammer, Thomas S. Dunn*, for appellee.

*James C. Bonner, Jr., Sarah L. Gerwig, Michael M. Mears, Holly L. Geerdes, Gerald R. Weber, Jr., John R. Martin, Nicholas A. Lotito*, amici curiae.