HULL, Circuit Judge,
dissenting:
In 1988, well before Atkins[1] in 2002, the State of Georgia led the nation by abolishing the death penalty for mentally retarded defendants. See O.C.G.A. § 17-7-131 (prohibiting death penalty where defendant proves mental retardation beyond reasonable doubt). The national consensus against executing the mentally retarded that gave birth to the Atkins prohibition was a consensus that Georgia started. And Georgia led the way by the very same statute in the very same form— § 17-7-131(c)(3), (j) — that the majority opinion now claims violates Atkins by using a reasonable-doubt standard.
After Atkins, the Georgia Supreme Court held that the reasonable-doubt standard in § 17-7-131 comports with the *1284 Eighth and Fourteenth Amendments. Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 621-22 (2003) (“Hill III”). In § 2254 cases, federal courts do not review state supreme courts’ decisions de novo. Rather, Congress has restricted federal review to only whether the state supreme court’s decision is “contrary to, or involved an unreasonable application of, dearly established Federal law, as determined by the Supreme Court of the United States” as of the date of the state supreme court decision. Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), codified in 28 U.S.C. § 2254(d)(1) (emphasis added). Discussing § 2254(d)(1) specifically, and unanimously reversing two federal circuit courts for granting habeas relief, the Supreme Court has admonished: “A legal principle is ‘clearly established’ within the meaning of this provision only when it is embodied in a holding of this [Supreme] Court.” Thaler v. Haynes, — U.S. -, 130 S.Ct. 1171, 1173, - L.Ed.2d - (2010) (emphasis added); see Berghuis v. Smith, — U.S. -, 130 S.Ct. 1382, 1392, 1395-96, 176 L.Ed.2d 249 (2010).
As the Georgia Supreme Court correctly noted, there is no holding in Atkins, or any other Supreme Court decision for that matter, invalidating a reasonable doubt standard for mental retardation claims. Just the opposite is true. Atkins expressly left it for the states to develop the procedural and substantive guides for determining who is mentally retarded. Bobby v. Bies, — U.S. -, 129 S.Ct. 2145, 2150, 173 L.Ed.2d 1173 (2009). And in the 218-year history of our nation’s Bill of Rights, no United States Supreme Court decision has ever suggested, much less held, that a burden of proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right.[2] Because there is no “clearly established” federal rule regarding the burden of proof for mental retardation claims, AEDPA mandates that this lower federal court leave the Georgia Supreme Court decision alone — even if we believe it incorrect or unwise — and affirm in this case. I respectfully dissent from the majority opinion’s blatant refusal to follow the express requirements of AEDPA.
I. BACKGROUND
It is important to the burden of proof issue that the whole story of this case be told. So I start at the beginning.

A. Mental Retardation and the Death Penalty

In 1988, long before Atkins in 2002, the Georgia General Assembly passed the nation’s first statute prohibiting the execution of mentally retarded persons. Specifically, O.C.G.A. § 17-7-131(c)(3) and (j) state:
[A criminal] defendant may be found “guilty but mentally retarded” if the jury, or court acting as trier of facts, finds beyond a reasonable doubt that the defendant is guilty of the crime charged and is mentally retarded. If the court or jury should make such finding, it shall so specify in its verdict.
In the trial of any case in which the death penalty is sought which commences on or after July 1, 1988, should the judge find in accepting a plea of not guilty but mentally retarded or the jury or court find in its verdict that the defendant is guilty of the crime charged but mentally retarded, the death penalty *1285 shall not be imposed and the court shall sentence the defendant to imprisonment for life.
O.C.G.A. § 17 — 7—131(c)(3), (j) (emphasis added).
One year later, in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court concluded that the Eighth Amendment did not prohibit the execution of the mentally retarded.[3] The Supreme Court noted that, as of that time, “[o]nly one State ... currently bans execution of retarded persons who have been found guilty of a capital offense.” Id. at 334, 109 S.Ct. at 2955 (citing Georgia’s O.C.G.A. § 17-7-131(3)).
That condition persisted until 2002, when the United States Supreme Court overruled Penry in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and declared that the Eighth Amendment’s “cruel and unusual punishment” provision prohibited the execution of mentally retarded offenders. Id. at 315-21, 122 S.Ct. at 2249-52.
Although the Supreme Court in Atkins recognized a national consensus against executing mentally retarded persons, it said that there was a notable lack of consensus on how to determine which offenders are mentally retarded:
To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded .... Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.
Atkins, 536 U.S. at 317, 122 S.Ct. at 2250. The Supreme Court added that although the states’ “statutory definitions of mental retardation are not identical, [they] generally conform to the clinical definitions” established by the American Association on Mental Retardation (“AARM”) and the American Psychiatric Association (“APA”). Atkins, 536 U.S. at 318 n. 22, 122 S.Ct. at 2250 n. 22.
In Atkins, the Supreme Court was careful not to fix the burden of proof or to impose rigid definitions of mental retardation. The Supreme Court left it to the states to develop “appropriate” procedures for mental-retardation determinations:
As was our approach in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.
Id. (quotation marks and brackets omitted) (emphasis added). As the Georgia Supreme Court noted in this very case, the Supreme Court in Atkins “made clear that it was entrusting the states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban.” Hill III, 587 S.E.2d at 620 (citing Atkins, 536 U.S. at 317, 122 S.Ct. at 2250).
In Bobby v. Bies, — U.S. -, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009), the Supreme Court pointed out that Atkins “did not provide definitive procedural or *1286 substantive guides for determining when a person who claims mental retardation ‘will be so impaired as to fall [within Atkins’ compass].’ ” 129 S.Ct. at 2150 (brackets in original). In its 2009 Bies decision, the Supreme Court repeated that Atkins had “left to the States the task of developing appropriate ways to enforce the constitutional restriction” on executing the mentally retarded. Id. (brackets omitted).
I turn to how the Georgia reasonable-doubt statute and Atkins intersect with Hill’s case.

B. Facts and Procedural History

In 1990, Hill was serving a life sentence for the murder of his girlfriend. But he murdered another person in prison. Using a nail-studded board, Hill bludgeoned a fellow inmate, Joseph Handspike, to death in his bed. Several inmates and a guard witnessed the murder.
Even locked up in jail for one murder, Hill continued to kill. The jury unanimously convicted Hill of malice murder and unanimously imposed a death sentence. See Hill v. State, 263 Ga. 37, 427 S.E.2d 770, 774 (1993) (“Hill I”). Despite the fact that O.C.G.A. § 17-7-131(c)(3) and (j) already exempted mentally retarded persons from execution at the time of Hill’s trial, Hill did not assert at trial that he was mentally retarded. To the contrary, Hill called clinical psychologist William Dickinson, who testified that Hill was mentally slow (his IQ was 77), but not mentally retarded.
On direct appeal in 1993, the Georgia Supreme Court affirmed Hill’s malice murder conviction and death sentence. Hill I, 427 S.E.2d at 772. On direct appeal, Hill made no claim of mental retardation.
In 1994, Hill filed a state habeas petition. Again he made no mental retardation claim. But five years after trial, Hill amended his petition to allege, inter alia, that he is mentally retarded. In 1997, the state habeas court granted Hill a writ of habeas corpus for the limited purpose of conducting a jury trial on Hill’s mental retardation claim, using a preponderance of the evidence standard.
The State appealed, and the Georgia Supreme Court reversed. Turpin v. Hill, 269 Ga. 302, 498 S.E.2d 52 (1998) (“Hill II”).[4] The Georgia Supreme Court concluded that § 17-7-131’s requirement that a defendant prove his mental retardation beyond a reasonable doubt applies to all defendants tried after the statute’s effective date in 1988. Id. at 53-54. The Georgia Supreme Court remanded Hill’s case to the state habeas court to determine, without a jury, whether Hill could establish under the reasonable-doubt standard that he is mentally retarded. Id.
On remand, the state habeas court ordered mental- evaluations, conducted- an evidentiary hearing, and then denied all of Hill’s claims. The order concluded that Hill had not proved he was mentally retarded under the reasonable-doubt standard. The state habeas court employed the definition of mental retardation in O.C.G.A. § 17-7-131(a)(3), which provides that “mentally retarded” means (1) having “significantly subaverage general intellectual functioning,” (2) “resulting in or asso *1287 ciated with impairments in adaptive behavior,” (3) “which manifested during the developmental period.”[5]
As to the first prong, the state habeas court found that Hill established beyond a reasonable doubt his “significantly subaverage general intellectual functioning.”[6]
As to the second prong, however, the state habeas court found Hill failed to show beyond a reasonable doubt that he had “impairments in adaptive behavior” such as “communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety.” The state habeas cowt noted Hill’s (1) extensive work history and “apparent ability to function well in stick employment,” (2) disciplined savings plans to purchase cars and motorcycles, (3) military service, (If) social life, (5) weak but sufficient writing skills, (6) ability to care for himself in home living except in periods of stress, and (7) health problems with seizures. The state habeas court did not discuss the third prong.
Hill moved the state habeas court to reconsider its denial in light of Atkins. Granting Hill’s motion, the state habeas court concluded that a preponderance of the evidence standard should be applied to Hill’s mental retardation claim. Although the state habeas court did not retreat from its earlier finding that Hill failed to show he was mentally retarded under the reasonable-doubt standard, the court stated it would find Hill to.be mentally retarded under the preponderance of evidence standard.
The State appealed. In 2003 the Georgia Supreme Court again reversed the state habeas court. See Hill III, 587 S.E.2d at 618. Because the majority opinion does not fully discuss the Georgia Supreme Court’s decision, I do. The Georgia Supreme Court concluded: (1) Hill could have had a jury trial on mental retardation under O.C.G.A. § 17-7-131(c)(3) at the time of his original guilt trial in 1991 if he *1288 had asked for one, but he waived that right; (2) Hill was only entitled to have the state habeas court — not a jury — assess his mental retardation claim; (3) Atkins applied retroactively, but Atkins entrusted to the states the task of developing procedures to enforce the ban on executing the mentally retarded; (4) “nothing in Atkins instructs the states to apply any particular standard of proof to mental retardation claims”; and (5) the Supreme Court’s decision in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), which upheld as constitutional the reasonable-doubt standard for insanity claims, supported Georgia’s reasonable-doubt standard in Hill’s case. Hill III, 587 S.E.2d at 619-21.
The Georgia Supreme Court concluded that Georgia’s reasonable-doubt standard was constitutionally acceptable for mental retardation claims. Id. The Georgia Supreme Court explained that O.C.G.A. § 17-7-131’s reasonable-doubt standard reflected an acceptable state legislative choice to define as mentally retarded those defendants who are able to prove their mental retardation beyond a reasonable doubt:
[A] higher standard of proof serves to enforce the General Assembly’s chosen definition of what degree of impairment qualifies as mentally retarded under Georgia law for the purpose of fixing the appropriate criminal penalty that persons of varying mental impairment should bear for their capital crimes .... [T]he Court in Atkins recognized that, despite a “national consensus” against executing mentally retarded persons, there might be “serious disagreement ... in determining which offenders are in fact retarded.” In view of the lack of national consensus as to which mentally impaired persons are constitutionally entitled to an exemption from death sentences, we conclude that the Georgia General Assembly ... was originally and remains within constitutional bounds in establishing a procedure for considering alleged mental retardation that limits the exemption to those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt.
Id. at 622 (citations omitted). It remanded Hill’s case to the state habeas court for entry of an order denying Hill’s state habeas petition. See id. at 618, 622-23. The state habeas court reinstated its earlier order finding Hill failed to prove mental retardation beyond a reasonable doubt.
In 2004, Hill filed a § 2254 petition, alleging that Georgia’s reasonable-doubt standard for mental retardation violates the Eighth and Fourteenth Amendments. The district court denied relief. Hill appealed.
II. STANDARD OF REVIEW
Hill’s § 2254 petition and appeal are governed by AEDPA. Owen v. See’y, Dep’t of Corr., 568 F.3d 894, 907 (11th Cir.2009), cert. denied, — U.S. -, 130 S.Ct. 1141, — L.Ed.2d - (2010). “Under AEDPA, our review of a final state habeas decision is ‘greatly circumscribed and is highly deferential to the state courts.’ ” Payne v. Allen, 539 F.3d 1297, 1312 (11th Cir.2008) (quoting Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir.2002)). Under 28 U.S.C. § 2254(d)(1), as amended by AEDPA, a state prisoner cannot obtain federal habeas relief unless he can show the decision of the state court “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States .... ” 28 U.S.C. § 2254(d)(1) (emphasis added). In this case, the only question is whether the Georgia Supreme Court’s decision — that *1289 the reasonable doubt standard for mental retardation claims is constitutional — is “contrary to, or involved an unreasonable application of, clearly established Federal law.” Id.[7]
As noted earlier, in two recent decisions, the Supreme Court unanimously reversed circuit appellate court decisions for not adhering to AEDPA’s requirement that the federal legal principle be “clearly established” before lower federal courts, like us, can reverse a state supreme court decision and grant federal habeas relief. Thaler, 130 S.Ct. 1171 (2010); Berghuis, 130 S.Ct. 1382 (2010). The Supreme Court instructed: “A legal principle is ‘clearly established’ within the meaning of this provision only ivhen it is embodied in a holding of this Court.” Thaler, 130 S.Ct. at 1173 (citing Carey v. Musladin, 549 U.S. 70, 74, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006); Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)) (emphasis added); see also Owen, 568 F.3d at 907 (“‘Clearly established Federal law’ means the holdings, not the dicta, of the United States Supreme Court.”).
In Thaler, the Supreme Court unanimously reversed the Fifth Circuit’s decision, which had concluded that a state court judge in ruling on a Batson challenge must reject a demeanor-based explanation for a challenge unless that judge personally observed and recalls the aspect of the prospective juror’s demeanor on which the explanation is based. Thaler, 130 S.Ct. at 1172. The Fifth Circuit concluded Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), “clearly established” that rule and thus reversed the Texas appellate court. Id. at 1173-74. In Snyder, the Supreme Court actually (1) did stress that when the explanation for a peremptory, challenge “invoke[s], a juror’s demeanor,” the trial judge’s “first hand observations” are of “great[ ] importance”; and (2) did point out that the peremptory challenge (based on nervousness) was not exercised until some time after the juror was questioned and the state trial judge might not have recalled the juror’s demeanor. Snyder, 552 U.S. at 477, 479, 128 S.Ct. at 1208-09. Despite Batson and Snyder, the Supreme Court in Thaler concluded the Fifth Circuit “read far too much into those decisions” and “no decision of this Court clearly establishes the categorical rule on which the [Fifth Circuit] Court of Appeals appears to have relied.” Thaler, 130 S.Ct. at 1172, 1175.
A month later, in Berghuis v. Smith, the Supreme Court unanimously reversed the Sixth Circuit’s decision, which had concluded that in determining whether a jury venire was drawn from a fair cross-section of the community, “courts should use the comparative disparity test to measure underrepresentation” where the allegedly excluded group is small, and the defendant’s comparative disparity statistics demonstrated that African-Americans’ representation in the County Circuit Court venires “was unfair and unreasonable.” Berghuis, 130 S.Ct. at 1391 (citing Smith v. Berghuis, 543 F.3d 326, 338 (6th Cir.2008)). In granting federal habeas relief and effectively reversing the Michigan Supreme Court’s denial of habeas relief, the Sixth Circuit relied on Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).[8]
*1290 Reversing the Sixth Circuit, the United States Supreme Court stated, “[O]ur Duren decision hardly establishes — no less ‘clearly’ so — that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community.” Berghuis, 130 S.Ct. at 1392. The Supreme Court added: “[Neither Duren nor any other decision of this Court specifies a method or test courts must use to measure the representation of distinctive groups in jury pools.” Id. at 1393.[9]
These two § 2254(d)(1) habeas decisions re-emphasize that petitioner Hill must show a “clearly established” federal law in the form of a United States Supreme Court holding before this lower federal court can overturn a Georgia Supreme Court decision.[10]
III. DISCUSSION
Although Hill had a right under § 17-7-131(j), well before Atkins, to claim that he was mentally retarded, Hill did not claim mental retardation at trial, on direct appeal, or in his original state habeas petition. Rather, five years after trial, Hill amended his state habeas petition to claim mental retardation. The state habeas court found Hill has not shown he is mentally retarded beyond a reasonable doubt, and Hill does not challenge that finding.
The majority opinion contends only that the Georgia Supreme Court’s decision upholding Georgia’s statutory reasonable-doubt standard is contrary to the United States Supreme Court’s Atkins decision. The majority’s position is that Georgia’s statute (which was at the vanguard of the “national consensus” leading the Supreme Court to abolish the execution of the mentally retarded in Atkins) is now unconstitutional under the authority of Atkins — even though Atkins does not require any fixed burden of proof, and leaves that procedural decision to the states. For several reasons, the majority opinion “read[s] far too much into” Atkins, and no decision of the Supreme Court establishes the burden-of-proof rule in mental retardation cases on which the majority relies. Thaler, 130 S.Ct. at 1172.

A. Atkins Left Procedural Rules to States

First, the Supreme Court in Atkins made no reference to, much less a holding on, the burden of proof. See Thaler, 130 *1291 S.Ct. at 1173; Owen, 568 F.3d at 907. To the contrary, the Supreme Court in Atkins noted the lack of agreement as to how mental retardation is to be determined, and expressly left the procedures for doing so to the states.[11] 536 U.S. at 317, 122 S.Ct. at 2250; see also Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir.2009) (“[T]he [Supreme] Court left to the states the development of standards for determining when an offender is mentally retarded.”). Therefore, Atkins provides no support for Hill’s or the majority opinion’s argument.
Atkins’s decision to leave the task to the states not only renders the federal law not “clearly established,” but also makes it “wholly inappropriate for this court, by judicial fiat, to tell the States how to conduct an inquiry into a defendant’s mental retardation.” In re Johnson, 334 F.3d 403, 405 (5th Cir.2003) (noting that Atkins explicitly left the procedures governing its implementation to the states).[12]
In Bies, the Supreme Court in 2009 reaffirmed that “[its] opinion [in Atkins] did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation ‘will be so impaired as to fall [within Atkins’ compass.]’ ” Bies, 129 S.Ct. at 2150. Bies made it clear that Atkins did not set forth procedural guidelines as to the burden of proof. Bies even repeated that Atkins “left to the States the task of developing appropriate ways to enforce the constitutional restriction.” Id.[13]
By this I do not mean to imply for a moment that the Supreme Court in Atkins concluded that the Constitution places no substantive restrictions upon procedures a state may employ in determining mental retardation; it simply did not consider or reach the burden-of-proof issue, and neither has any subsequent Supreme Court opinion. Nor do I gainsay the possibility that the Supreme Court may later determine that a reasonable-doubt standard for establishing the mental retardation exception to execution is constitutionally impermissible. But under AEDPA, we are not concerned with what a United States Sú *1292 preme Court holding could or should be in the future, but only what it was as of the time of the Georgia Supreme Court’s decision in Hill III in 2003.

B. Beyond-a-Reasonable-Doubt Standard Upheld for Insanity Defense

Second, in the absence of any Supreme Court burden-of-proof holding in mental retardation execution cases, the Georgia Supreme Court looked to the Supreme Court’s insanity decisions in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (rejecting due process challenge to reasonable doubt standard for establishing insanity plea), and Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (recognizing Eighth Amendment prohibits execution of insane persons and allowing states to decide ways to enforce that constitutional restriction). The Georgia Supreme Court determined, inter alia, that “a mental retardation claim is comparable to a claim of insanity” in that “both relieve a guilty person of at least some of the statutory penalty to which he would otherwise be subject.” Hill III, 587 S.E.2d at 621. Both Leland and Ford support the Georgia Supreme Court’s decision.[14]
At the time of Leland, Oregon was the only state that required a defendant to establish a plea of insanity beyond a reasonable doubt. Nonetheless, in Leland the Supreme Court determined that that fact was not dispositive and that Oregon’s reasonable-doubt standard for insanity pleas was constitutional, stating:
Today, Oregon is the only state that requires the accused, on a plea of insanity, to establish that defense beyond a reasonable doubt. Some twenty states, however, place the burden on the accused to establish his insanity by a preponderance of the evidence or some similar measure of persuasion. While there is an evident distinction between these two rules as to the quantum of proof required, we see no practical difference of such magnitude as to be significant in determining the constitutional question we face here. Oregon merely requires a heavier burden of proof. ... The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.
Leland, 343 U.S. at 798, 72 S.Ct. at 1007 (footnote, quotation marks, and citation omitted) (emphasis added).[15] The Leland Court noted that a defense of insanity lessened one’s culpability, which is the same basis used for Eighth Amendment protection in Atkins.[16] Id. at 796-97, 72 S.Ct. at 1006-07.
*1293 And further, in Ford, as in Atkins, the Supreme Court refused to impose any particular burden of proof on the right of the insane not to be executed and left “to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” 477 U.S. at 416-17, 106 S.Ct. at 2605 (plurality opinion). In Ford, a majority of the Supreme Court first held that the Eighth Amendment prohibited execution of insane persons. Then, in a portion of the lead opinion garnering plurality support, the Supreme Court stated that “[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of non-meritorious or repetitive claims of insanity.” Id. at 417, 106 S.Ct. at 2605 (emphasis added).[17]

C. Hill’s Cooper Argument

Hill relies on Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), which held that an Oklahoma law— requiring a defendant to prove incompetence to stand trial by clear and convincing evidence — violated the Due Process Clause. Id.. at 366-69, 116 S.Ct. at 1383-84. The Georgia Supreme Court concluded that the insanity cases of Leland and Ford are more comparable to mental retardation than is the incompetency issue in Cooper. See Hill III, 587 S.E.2d at 621-22.
First, Cooper emphasized that (1) the Supreme Court had historically and consistently recognized that “the criminal trial of an incompetent defendant violates due process”; and (2) the historical common-law standard of proof for incompetency in both English and American cases was preponderance of the evidence. Cooper, 517 U.S. at 354-56, 116 S.Ct. at 1376-77. In contrast, there is no historical Eighth Amendment right of a mentally retarded person not to be executed. And since the constitutional right itself is new, there is no historical tradition regarding the burden of proof as to that right. As recently as 1989, Penry refused to bar the execution of the mentally retarded. Even Atkins was based not on historical tradition or the Due Process Clause, but on the contemporary national consensus that reflected “the evolving standards of decency” that informed the meaning of the Eighth Amendment. Atkins, 536 U.S. at 311-12, 122 S.Ct. at 2247. Indeed, Georgia’s reasonable doubt standard for establishing a mental retardation exception to the death penalty, at twenty-two years old, is the oldest such law in the nation. Although other states recently have employed either elear-and-convineing-evidence or prepon *1294 derance-of-evidence standards, no more lenient standard of proof predates Georgia’s. Thus, Cooper’s due process analysis does not help Hill.

D. Majority Opinion’s “Evisceration” Argument

The core of the majority opinion’s argument is only that (1) Atkins prohibits the execution of mentally retarded persons, (2) a person who meets the preponderance of the evidence standard is more likely than not mentally retarded, and (3) thus Georgia’s reasonable-doubt procedural rule substantially burdens and “effectively eviscerates” the Eighth Amendment substantive right of the mentally retarded not to be executed.
As noted earlier, in the 218-year history of our nation’s Bill of Rights, no Supreme Court decision has ever held, or even implied, that a burden-of-proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right. Because there is no “clearly established” federal law supporting Hill’s position, AEDPA mandates that we leave alone the Georgia Supreme Court’s denial of Hill’s constitutional challenge to Georgia’s statutory reasonable-doubt standard.[18] See Berghuis, 130 S.Ct. at 1391-92, 130 S.Ct. 1382; Thaler, 130 S.Ct. at 1173.
Even Atkins itself does not support the majority opinion’s argument. Atkins did not bestow a substantive Eighth Amendment right on a fixed and rigid definition of “mentally retarded persons.” The Supreme Court in Atkins stressed that “there is serious disagreement” in how to determine who is mentally retarded and “[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.” Atkins, 536 U.S. at 317, 122 S.Ct. at 2250. Indeed, various states use different definitions of intellectual functioning (some draw the line at an IQ of 75 or below, some at 70 or below, others at 65 or below)[19] and different factors in assess *1295 ing adaptive functioning. And states use different procedures for determining who is actually mentally retarded. Atkins expressly left to the states “the task of developing appropriate ways to enforce the constitutional restriction” regarding mental retardation. Id.
Hill’s Eighth Amendment right is inextricably bound up in his ability to comply with the state’s procedural and substantive requirements for determining mental retardation. Cf. Walker v. True, 399 F.3d 315, 319-20 (4th Cir.2005) (“While Walker’s claim ultimately derives from his rights under the Eighth Amendment, whether he is mentally retarded is governed by Virginia law.”). Atkins’s substantive Eighth Amendment right is bestowed on only an individual who comports with the state processes that determine who is mentally retarded. Given that Hill failed to meet Georgia’s reasonable-doubt standard, he failed to demonstrate that he is mentally retarded, and therefore, failed to prove an impending Eighth Amendment violation. Because Hill has not established mental retardation beyond a reasonable doubt, a denial of Hill’s petition does not result in the execution of a mentally retarded individual under Georgia law.[20]
In any event, because Atkins never said, or even hinted at (much less held), what procedures are or are not “appropriate” for implementing the prohibition Atkins recognized, Atkins a fortiori does not provide “clearly established” federal law for Hill’s claims. To accept the majority opinion’s argument would require us to run far afield from Atkins’s actual language and to abandon the deference AEDPA demands. And the United States Supreme Court just this year has twice re-emphasized the constraints AEDPA imposes on federal circuit courts.
The majority opinion focuses on Georgia’s burden-of-proof procedure and ignores every other procedural protection afforded under Georgia’s statute. Looking solely to one aspect of Georgia’s procedures, without placing them in context, is inconsistent with Ford, where the Supreme Court evaluated Florida’s process as a whole.[21]
*1296 Georgia’s process, when evaluated as a whole, contains substantial procedural protections. Georgia law guarantees Hill the rights: (1) to a full and fair plenary trial on his mental retardation claim, as part of the guilt phase of his capital trial; (2) to present his own experts and all other relevant evidence; (3) to cross-examine and impeach the state’s experts; (4) to have a neutral factfinder (the jury, if Hill had elected to have mental retardation decided during the guilt phase, and a judge if otherwise) decide the issue; (5) to orally argue before the factfinder; and (6) to appeal any mental retardation determination. Within the bounds of evidentiary admissibility, there is virtually no limit to the evidence a Georgia defendant can present in support of his mental retardation claim. Thus, the reasonable-doubt standard is but one aspect of a detailed and comprehensive fact-finding process under Georgia law.[22] This is not to say what the ultimate outcome of the constitutional issue in this case should be, but only serves to illustrate further how Atkins did not decide the burden-of-proof question here.
As did the Atkins Court, Justice Powell’s concurring opinion in Ford made clear its refusal to clearly establish any precise limit on a state’s fact-finding procedures for determining the insanity bar to execution aside from a few core due process rights. See Ford, 477 U.S. at 427, 106 S.Ct. at 2610 (Powell, J., concurring in part and concurring in the judgment) (“The State should provide an impartial officer or board that can receive evidence and argument from the prisoner’s counsel, including expert psychiatric evidence that may differ from the State’s own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake.”) (emphasis added).
Atkins left the states substantial leeway. And Georgia has exercised that leeway by setting the IQ level at 70 (lower than some states, which set it at 75), and by determining that the risk of error due to malingering or other factors is substantial and that there is a need for a robust burden of proof. This is exemplified in Hill’s case where Hill’s initial expert (clinical psychologist William Dickinson) initially testified Hill had an IQ of 77 and was not mentally retarded, and Hill never claimed mental retardation at trial, on direct appeal, or in his first state habeas petition. The habeas record also documents Hill’s (1) extensive work history and ability to function well; (2) disciplined savings plans to purchase cars and motorcycles; (3) military service; and (4) active social life. This is not to diminish the critical importance of the At *1297 kins right not to be executed if mentally-retarded. It is only to say that the Georgia Supreme Court’s decision was not contrary to “clearly established” federal law.
IV. CONCLUSION
Even if the Georgia Supreme Court’s decision is considered incorrect or unwise by a federal judge, and even if the State of Georgia has inappropriately struck the balance between two competing interests in § 17-7—131 (c)(3), AEDPA precludes federal circuit courts from imposing their will, invalidating a state statute, § 17-7-131(c)(3), as unconstitutional, and reversing the Georgia Supreme Court’s decision in the absence of “clearly established” federal law, which the United States Supreme Court admonishes is a holding of that Court. There is no United States Supreme Court case suggesting, much less holding, that a reasonable-doubt burden of proof for claims of mental retardation violates the Eighth Amendment.[23] Atkins did not answer that question. Whether I agree with the Georgia Supreme Court or not, AEDPA requires that this federal court affirm the denial of Hill’s § 2254 petition. Indeed, I need not decide the constitutional question as to Georgia’s burden of proof statute, but say only that the United States Supreme Court has not decided it either and thus I must sustain the Georgia Supreme Court’s decision. Accordingly, I must dissent from the majority’s invalidating a state statute as unconstitutional, effectively reversing the Georgia Supreme Court’s decision, and refusing to follow AEDPA.

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. The majority opinion, and Atkins, are not based on the Fourteenth Amendment's Due Process Clause and a defendant's procedural right to a fair trial, but only on the Eighth Amendment’s cruel and unusual punishment prohibition.

. Shortly after the passage of O.C.G.A. §17-7 — 131(c)(3) and (j), the Georgia Supreme Court upheld a state constitutional challenge to the death penalty as applied to mentally retarded defendants who were tried before the effective date of the statute. Fleming v. Zant, 259 Ga. 687, 386 S.E.2d 339 (1989), superseded, in part by statute, Turpin v. Hill, 269 Ga. 302, 498 S.E.2d 52, 53-54 (1998). Thus, thirteen years before Atkins in 2002, the Georgia Supreme Court concluded that executing a mentally retarded defendant constitutes cruel and unusual punishment as defined in the Georgia Constitution. Id. at 342.

. The Georgia Supreme Court noted that (1) Hill was tried three years after the 1988 effective date of § 17 — 7—131(c)(3) and 0, and (2) Hill never alleged (either at trial in 1991 or on direct appeal in 1993) that he was mentally retarded. Hill II, 498 S.E.2d at 52. Therefore, Hill’s claim was procedurally defaulted. Id. Nevertheless, the Georgia Supreme Court concluded that, to the extent that Hill’s mental retardation claim challenged the imposition of the death penalty, it fell within Georgia's “miscarriage of justice” exception to its procedural default rules. Id. at 53.

. All parties agree that Georgia's statutory definition of mental retardation is consistent with the AARM and APA clinical definitions of mental retardation quoted in Atkins. In Stripling v. State, 261 Ga. 1, 401 S.E.2d 500 (1991), the Georgia Supreme Court stated that the "significantly subaverage general intellectual functioning” prong of the mental-retardation definition "is generally defined as an IQ of 70 or below,” but that "an IQ test score of 70 or below is not conclusive” because "an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate.” Id. at 504. Similarly, in Atkins, the Supreme Court noted that an IQ score between 70 and 75 "is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.” Atkins, 536 U.S. at 309 n. 5, 122 S.Ct. at 2245 n. 5.

. Before trial in 1991, clinical psychologist Dickinson evaluated Hill using the Weschsler Adult Intelligence Scale, Revised ("WAIS-R”) test. Hill's full-scale IQ score on the WAIS-R was 77. Dickinson also administered to Hill in 1991 the Peabody Picture Vocabulary Test ("PPVT”), on which Hill earned an estimated IQ score of 74. Records show Hill took the PPVT when he was in second grade, and scored a 75.
In 1997, in Hill's state habeas proceedings, Dr. Daniel Grant evaluated Hill using the Stanford-Binet Intelligence Test, and Hill received an IQ score of 72. In 2000, Dr. Jethro Toomer administered the Weschler Adult Intelligence Scale III ("WAIS-III”) to Hill. Hill’s full-scale IQ score on the WAIS-III was 69.
Hill produced an affidavit from Dickinson in 2000 stating that his earlier finding of no mental retardation was erroneous because it was based on inadequate information, and his original IQ testing of Hill led to an inaccurate and misleading result. See Hill II, 498 S.E.2d at 52 n. 1. In this affidavit, Dickinson opined that tire 1991 WAIS-R overestimated Hill’s IQ by 3-7 points.

. We generally review de novo the legal conclusions reached by the district court in denying Hill's § 2254 petition. Owen, 568 F.3d at 907. We review the district court's factual findings for clear error, and mixed questions of law and fact de novo. Id.

. The Supreme Court in Duren set forth the following showing required for a prima facie *1290 claim that a petit jury was not drawn from a fair cross section of the community:
In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the juiyselection process.
Duren, 439 U.S. at 364, 99 S.Ct. at 668.

. See also Renico v. Lett, - U.S. -, 130 S.Ct. 1855, 1860, 1862-66, 176 L.Ed.2d 678 (2010) (reversing the Sixth Circuit’s grant of federal habeas relief to Michigan prisoner because Sixth Circuit failed to grant Michigan Supreme Court's decision appropriate deference required by AEDPA).

. Like the Fifth Circuit and Sixth Circuit decisions the Supreme Court reversed in Thaler and Berghuis, respectively, the majority opinion quotes the governing AEDPA standard, which prohibits the grant of habeas relief unless the state supreme court decision is contrary to, or an unreasonable application of, "clearly established” federal law. See Haynes v. Quarterman, 561 F.3d 535, 538 (5th Cir.2009); Smith v. Berghuis, 543 F.3d 326, 334-35 (6th Cir.2008). The majority opinion then wholly ignores that AEDPA standard, especially the fact that "clearly established” federal law must be embodied in prior United States Supreme Court holdings.

. Moreover, the Atkins Court cited the Georgia statute at issue here—O.C.G.A. § 17-7-131, which then, as now, required mental retardation to be proven beyond a reasonable doubt — without criticism. Atkins, 536 U.S. at 313-14 & n. 9, 122 S.Ct. at 2248 & n. 9.

. The state supreme courts are split on the burden of proof issue in mental retardation cases. See, e.g., State v. Grell, 212 Ariz. 516, 135 P.3d 696, 705 (2006) (finding clear and convincing evidence standard for mental retardation claims is constitutional); People v. Vasquez, 84 P.3d 1019, 1023 (Colo.2004) (stating that "the substantive restriction oí Atkins" does not limit Colorado's "discretion in allocating and quantifying the appropriate burden of proof’); Hill III, 587 S.E.2d at 621-22; but see Pruitt v. State, 834 N.E.2d 90, 103 (Ind.2005) (invalidating clear and convincing evidence scheme for mental retardation claims based not on clearly established Supreme Court holdings but on the “implication” of Atkins); State v. Williams, 831 So.2d 835, 860 (La.2002) (stating decision to invalidate clear and convincing evidence requirement was one made in "the absence of any guidance from the Supreme Court”). State supreme courts are not constrained by AED-PA like federal circuit courts are.

. It is therefore hardly surprising that in three of Georgia's post-Atkins death penalty cases, Schofield v. Holsey, 281 Ga. 809, 642 S.E.2d 56 (Ga.), cert. denied, 552 U.S. 1070, 128 S.Ct. 728, 169 L.Ed.2d 569 (2007); Head v. Stripling, 277 Ga. 403, 590 S.E.2d 122 (2003), cert. denied, 541 U.S. 1070, 124 S.Ct. 2400, 158 L.Ed.2d 976 (2004); King v. State, 273 Ga. 258, 539 S.E.2d 783 (2000), cert. denied, 536 U.S. 982, 123 S.Ct. 17, 153 L.Ed.2d 880 (2002), the Supreme Court denied capital defendants’ certiorari petitions that made the same constitutional reasonable-doubt challenge that Hill makes here. If anything, this demonstrates that Atkins did not establish — let alone “clearly establish” — that Georgia's reasonable-doubt standard is unconstitutional.

. The majority opinion here improperly dismisses Leland in a footnote and never discusses Ford. The majority opinion also fails to acknowledge that Ford involved the Eighth Amendment right of a defendant not to be executed if insane and in Ford the Supreme Court left Leland’s reasonable-doubt standard fully intact even though it recognized an insane defendant had an Eighth Amendment right not to be executed.

. The Supreme Court in Leland also stated, "We are ... reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice.” Id. at 799, 72 S.Ct. at 1007-08.

. See Atkins, 536 U.S. at 316, 318, 122 S.Ct. at 2249, 2250-51 (stating, "our society views mentally retarded offenders as categorically less culpable than the average criminal,” and "[t]heir deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability”).

. The plurality opinion in Ford discussed the procedures by which a state will determine insanity-based exclusion from execution under the Eighth Amendment:
[W]e must conclude that the State's procedures for determining sanity are inadequate to preclude federal redetermination of the constitutional issue. We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences. It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity. Other legitimate pragmatic considerations may also supply the boundaries of the procedural safeguards that feasibly can be provided.
Id. at 416-17, 106 S.Ct. at 2605 (footnote and citation omitted). The plurality opinion noted that Florida's procedure was deficient for not furnishing the procedural safeguards of: an opportunity for the prisoner to submit evidence, an opportunity for the prisoner to impeach or challenge the opinions of the state-appointed mental health experts, and placement of factfinding authority in the hands of a neutral party. Id. at 413-16, 106 S.Ct. at 2603-05.

. Two very experienced district court judges in our circuit have examined the Georgia statute and similarly failed to see a “clearly established” right to a more lenient burden of proof in the mental retardation context. See Ledford v. Head, No. 1:02-CV-1515-JEC, 2008 WL 754486, at *3 n. 6 (N.D.Ga. Mar. 19, 2008) (Carnes, J.) ("There is no language in Atkins to suggest that Georgia’s standard is constitutionally impermissible. In fact, the Supreme Court cited Georgia’s statute with approval.”); Ferrell v. Head, 398 F.Supp.2d 1273, 1295 (N.D.Ga.2005) (Thrash, J.) ("Atkins makes it abundantly clear that each state is permitted to design its own system for determining mental retardation, insofar as such system does not wholly erode the constitutional prohibition against execution of the mentally retarded. The Petitioner fails to persuade this Court that Georgia's statute so erodes this prohibition.”).

. See, e.g., Ariz.Rev.Stat. Ann. § 13-753 (establishing procedure by which defendants in capital cases are pre-screened by psychological expert who administers IQ test; those with scores below 76 are tested further by mental retardation experts, and if the defendant then scores 70 or below on any IQ test, the court conducts a hearing at which the defendant must prove mental retardation by clear and convincing evidence; a "determination by the trial court that the defendant’s intelligence quotient is sixty-five or lower establishes a rebuttable presumption that the defendant has mental retardation,” but “a defendant with an intelligence quotient of seventy or below” can still prove mental retardation by the clear and convincing evidence standard); Ark.Code Ann. § 5-4-618(a)(2) ("There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below.”); 725 Ill. Comp. Stat. § 5/114-15(d) ("An intelligence quotient (IQ) of 75 or below is presumptive evidence of mental retardation.”); Ky.Rev.Stat. Ann. § 532.130 (“ 'Significantly subaverage general intellectual functioning is defined as an intelligence quotient (I.Q.) of *1295 seventy (70) or below.”); Neb.Rev.Stat. § 28-105.01(3) ("An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation.”); S.D. Codified Laws § 23A-27A-26.2 ("An intelligence quotient exceeding seventy on a reliable standardized measure of intelligence is presumptive evidence that the defendant does not have significant subaverage general intellectual functioning.”); Wiley v. Epps, 668 F.Supp.2d 848, 897 (N.D.Miss.2009) (“In Mississippi, [an] IQ of 75 is the 'cutoff score' for assessing subaverage intellectual functioning for purposes of diagnosing mental retardation.”).

. The majority opinion's facile argument that the Eighth Amendment requires a preponderance of the evidence standard for mental retardation claims because a more stringent standard of proof "necessarily will result in the deaths of mentally retarded individuals” ignores not only that a risk of error exists with any burden of proof, but also that Atkins did not purport to establish a nationwide procedural or substantive standard for determining mental retardation. See Atkins, 536 U.S. at 317, 122 S.Ct. at 2250 (noting “serious disagreement ... in determining which offenders are in fact retarded,” and that ”[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus”).

. Florida law directed the Governor to appoint a commission of three psychiatrists to simultaneously examine the defendant and then to provide an ex parte report to the Governor. The Supreme Court found that Florida’s process suffered from a number of grievous flaws: (1) defendants were not included at all in the "truth-seeking process”; (2) defendants were prohibited from submitting material to the fact-finder; (3) there was no opportunity for the defendant to challenge or impeach state-appointed experts; (4) the *1296 psychiatric examination of defendant Ford was only 30 minutes long; and (5) the insanity evaluation process was housed exclusively within the province of the executive branch, which gave the Governor the final say over fact-findings needed to trigger the constitutional protection. See Ford, 477 U.S. at 416, 106 S.Ct. at 2605 ("In no other circumstance of which we are aware is the vindication of a constitutional right entrusted to the unreviewable discretion of an administrative tribunal.") (plurality opinion).

. If anything, Georgia's procedural protections go above and beyond the protections required by Ford. For starters, the plurality opinion in Ford made clear that it did not "suggest that only a full trial on the issue of sanity will suffice to protect the federal interests.” Id. Here, Georgia provides for a full trial on the issue of mental retardation, complete with the age-old, common law reasonable-doubt standard. Furthermore, Justice Powell’s decision to join the four-vote plurality in Ford was based not on plucking out one piece of Florida's procedure, but rather on his assessment that all of "the procedures followed by Florida in this case do not comport with basic fairness.” Id. at 399, 106 S.Ct. at 2609 (emphasis added).

. There is no evidence in this record to support the proposition that the reasonable-doubt burden triggers an unacceptably high error rate for a capital case. Whether the burden of proof scheme will result in an unacceptably high error rate is, in part, an empirical question that we are ill-equipped to measure in the first instance. There is no data on this question in this record.
The majority is left to assert in note 8, without any support, that a defendant will rarely, if ever, be able to prove he is mentally retarded beyond a reasonable doubt because experts will simply disagree. Experts in criminal cases have disagreed for years on numerous matters, such as on ballistics, insanity, DNA analysis, serology, pathology, fingerprints, handwriting, hair and fiber analysis, the reliability of eyewitness testimony, etc. But that has never invalidated a burden-of-proof procedural standard. At least in this record, there is no data to support the majority's position.